# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 20, 2016 Session

## IN RE JAKOB O., ET AL.

**Appeal from the Juvenile Court for Rutherford County**
**No. TC1674T          Donna Scott Davenport, Judge**

_____

**No. M2016-00391-COA-R3-PT – Filed December 15, 2016**

_____

Upon petition of the Tennessee Department of Children's Services ("the Department"), the trial court terminated the parental rights of Mother. We reverse the trial court's determination that Mother willfully failed to support her children prior to her incarceration and its determination that she failed to substantially comply with the requirements of the family permanency plans created in this case. However, clear and convincing evidence supports the remaining grounds for termination relied upon by the trial court, as well as the trial court's determination that the termination of Mother's parental rights is in the children's best interest. Accordingly, we affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal of Right; Judgment of the Juvenile Court  Reversed in Part , Affirmed in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and KENNY ARMSTRONG, JJ., joined.

Carl Moore, Murfreesboro, Tennessee, for the appellant, Jessica K.

Herbert H. Slatery, III, Attorney General and Reporter, Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

In this appeal, we address the termination of parental rights of Jessica K. ("Mother") to her two children, Jakob O. and Lukas O.[1]  Jakob was born in June 2003;

---

[1] In cases involving minor children, it is this Court's policy to redact names sufficient to protect the

Lukas was born several years later in August 2010. Although the children's father, Bobby O. ("Father"), resided with Mother off-and-on over the years, the two never married.

The children first came into the custody of the Department in 2010 shortly after Lukas tested positive for drugs at his birth. Although Father was not living with Mother at this time, he later moved in with her in the spring of 2011. By September 2011, however, Father had moved out from Mother's home following a domestic violence episode between them. The children were eventually returned to Mother in December 2011 at the conclusion of a trial home pass, but by order of the Rutherford County Juvenile Court, Father's visitation with the children was restricted to four hours per month with a supervising agency.

Despite the restriction imposed on Father's visitation with the children, Mother allowed Father to move back in with her and the children sometime around August 2012. A few short months later, in October 2012, the children were removed from Mother's home a second time after the Department received a referral with "allegations of drug exposed child, environmental neglect[,] and educational neglect." In light of its investigation into the children's circumstances, the Department petitioned to have the children declared dependent and neglected.

In an affidavit filed in support of the Department's petition to declare the children dependent and neglected, a Department employee outlined the specific risks that necessitated the children's removal from Mother's home:

> At the time of the current referral, DCS arrived at the home to address concerns listed in this referral. CPSA Jones was advised by [Father] that Jakob had missed school due to illness. Jakob had been taken to the doctor by [Mother] at this time. [Father] was drug screened at that time and was positive for Benzoidiazapine but did not have a prescription. [Father] denied the use of any medications other than Advil over the counter. [Mother] and Jakob returned to the home. [Mother] was drug screened and was negative for all substances. [Mother] was screened a second time after Jakob admitted that he provided urine for his mother. That drug screen also yielded negative results. A third drug screen was administered by law enforcement to [Mother] which yielded positive results for THC. Law enforcement was present at this time and contacted the codes departments. Dennis Blair, Fire Inspector for City of Lavergne Codes Department came to the home . . . and deemed the home uninhabitable due to the condition of

children's identities.

- 2 -

the home. There were dishes in the sink growing mold and bacteria. Old food was found in the children's bedrooms and there were flies and knats [sic] throughout the home. The carpet was filthy with what appeared to be animal feces and there was a strong unpleasant odor in the home. The outside of the home had several trash bags that appeared to have been there for some time. There was wood and nails lying at the entrance of the home. There were two containers outside the garage and according to [Father], they were filled with gasoline.

On October 24, 2012, the Juvenile Court entered a protective custody order placing the children in the temporary custody of the Department.[2] A hearing on the Department's dependency and neglect petition later occurred on February 13, 2013. Following the hearing, by order entered on March 6, 2013, the Juvenile Court found the children dependent and neglected. In pertinent part, the Juvenile Court's March 6 order stated as follows: "(1) Mother exposed the Children to environmental neglect in her home; (2) that the home was in such condition of neglect that it was condemned by the local codes department; (3) that the neglect found in the home was of such a degree and was unsafe that the Mother was arrested for Reckless Endangerment; and (4) that the oldest Child . . . was educationally neglected."

Following the children's removal from Mother's home in October 2012, a number of family permanency plans were created. The first of these plans was created on November 8, 2012. Among other things, the November 8, 2012 permanency plan directed Mother to: "abide by the rules of probation," refrain from the use of alcohol or drugs, participate in random drug screens and pill counts, participate in "a non-self reporting clinical assessment with an A&D and parenting component and follow all recommendations," show proof of legal means of income, provide the Department with a budget, and provide the Department with childcare and transportation plans. The record shows that on the same day that the first permanency plan was created, Mother received a copy of the "Criteria & Procedures for Termination of Parental Rights."

The second permanency plan was created on May 20, 2013. Save for a few additional requirements, Mother's requirements under the second permanency plan were substantially similar to what was required of her under the first plan. According to the second permanency plan, Mother's alcohol and drug assessment, which had been completed in December 2012, recommended that Mother receive counseling to address her grief, participate in relationship counseling with Father, and receive homemaker services. Following the creation of the second permanency plan, additional permanency

---

[2] The terms of the order state that the children were placed into the Department's custody effective October 22, 2012.

plans were created on November 18, 2013, May 27, 2014, and December 3, 2014. Mother's requirements under these latter three plans were virtually the same as those established under the first two permanency plans.

On January 10, 2014, the Department filed a petition to terminate Mother's parental rights in the Rutherford County Juvenile Court.[3] At the time that the petition was filed, Mother was incarcerated for a violation of probation. According to Mother, she had been on probation for two separate charges: a DUI offense and reckless endangerment. The reckless endangerment charge specifically stemmed from the condition of Mother's home at the time her children were removed in October 2012. In support of its request to terminate Mother's parental rights, the Department averred that the following grounds for termination existed: (1) abandonment by failure to visit, Tenn. Code Ann. § 36-1-102(1)(A)(i); (2) abandonment by failure to support, Tenn. Code Ann. § 36-1-102(1)(A)(i); (3) abandonment by an incarcerated parent for failure to visit, Tenn. Code Ann. § 36-1-102(1)(A)(iv); (4) abandonment by an incarcerated parent for failure to support, Tenn. Code Ann. § 36-1-102(1)(A)(iv); (5) abandonment by engaging in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare, Tenn. Code Ann. § 36-1-102(1)(A)(iv); (6) abandonment by failure to provide a suitable home, Tenn. Code Ann. § 36-1-102(1)(A)(ii); (7) substantial noncompliance with the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); and (8) persistent conditions, Tenn. Code Ann. § 36-1-113(g)(3).

The trial in the case took place over several dates, beginning on April 23, 2015 and concluding on November 10, 2015. On December 1, 2015, the trial court issued an oral ruling from the bench and determined that Mother's parental rights should be terminated. A written order memorializing this ruling was later entered by the trial court on February 5, 2016. Pursuant to its February 5 written order, the trial court concluded that Mother's parental rights should be terminated on six of the eight grounds asserted against Mother in the Department's petition. Specifically, the trial court concluded that: (1) Mother had abandoned the children by failing to visit them prior to incarceration; (2) Mother had abandoned the children by failing to support them prior to incarceration; (3) Mother had abandoned the children by engaging in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare; (4) Mother had abandoned the children by failing to establish a suitable home; (5) a persistence of conditions existed that prevented the children's return to Mother; and (6) Mother had failed to substantially comply with the permanency plans. The trial court also concluded that the termination of Mother's parental rights would be in the children's best interests. Mother thereafter filed a timely notice of appeal.

---

[3] The Department also sought to terminate the parental rights of Father. Although Father's parental rights were eventually terminated by the trial court, he did not appeal.

**ISSUES**

In her brief on appeal, Mother raises seven issues for our review, which we have slightly restated as follow:

1.      Whether the trial court erred in finding abandonment by failure to visit prior to incarceration.

2.      Whether the trial court erred in finding abandonment by failure to support prior to incarceration.

3.      Whether the trial court erred in finding abandonment by wanton disregard.

4.      Whether the trial court erred in finding abandonment by failure to provide a suitable home.

5.      Whether the trial court erred in finding persistence of conditions.

6.      Whether the trial court erred in finding substantial noncompliance with the permanency plans.

7.      Whether the trial court erred in finding that termination of Mother's parental rights is in the children's best interest.

We note that even if the issues raised in Mother's brief had not been this comprehensive, our review on appeal would not be limited. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

**STANDARD OF REVIEW**

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007) (citations omitted). "Although this right is fundamental and superior to claims of

other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citation omitted). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, proceedings to terminate parental rights are governed by statute. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143 (citations omitted).

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.* (citations omitted).

## DISCUSSION

Consistent with the Tennessee Supreme Court's direction in *In re Carrington H.*, we are required to review the trial court's findings as to each ground for termination. *See In re Carrington H.*, 483 S.W.3d at 525-26. Accordingly, in the analysis that follows, we review each ground for termination relied upon by the trial court separately. However, notwithstanding the comprehensive nature of our review, we ultimately need only find that one ground for termination was established in order to uphold the trial court's decision. *In re Valentine*, 79 S.W.3d at 546.

**Abandonment**

The first ground for termination listed in our termination statute, and the most frequently relied on, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862 (citations omitted). The acts that constitute abandonment are outlined in Tennessee Code Annotated section 36-1-102, which provides five alternative definitions. In this case, the trial court determined that Mother's actions satisfied four bases for abandonment included among the statutory definitions. We address each of its conclusions regarding Mother's abandonment in turn.

*Abandonment Under Tenn. Code Ann. § 36-1-102(1)(A)(iv): Abandonment by Willful Failure to Visit, Willful Failure to Support, and Wanton Disregard*

The first three bases of abandonment relied upon by the trial court are contained in the definition of abandonment outlined at Tennessee Code Annotated section 36-1-102(1)(A)(iv). Pursuant to that statutory definition, a parent's parental rights may be terminated when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[4]

We have previously acknowledged that the above statute contains "two distinct tests for abandonment" both of which "apply only if a parent is incarcerated at or near the time of the filing of the termination petition." *In re Audrey S.*, 182 S.W.3d at 865. The first test, which itself contains alternative bases for abandonment, "asks whether the parent 'has willfully failed to visit[,] . . . support[,] or . . . make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding

---

[4] Although the current version of Tennessee Code Annotated section 36-1-102(1)(A)(iv) has additional sentences to this definition of abandonment, *see* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2016), the amended definition was not effective until July 1, 2016, which was after the trial of this case.

such parent's . . . incarceration.'" *Id.* (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)). Although this test tracks the language of the statutory definition of abandonment under Tennessee Code Annotated § 36-1-102(1)(A)(i), it "shifts the focus from the four-month period immediately preceding the filing of the termination petition to the four-month period immediately preceding the parent's incarceration." *Id.*

In this case, the trial court concluded that two bases of abandonment under the "first test" of Tennessee Code Annotated section 36-1-102(1)(A)(iv) were established. First, it determined that Mother abandoned the children by willfully failing to visit the children prior to her incarceration. For purposes of this ground of abandonment, "willfully failed to visit" means "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is visitation that, under the circumstances of the particular case, "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" *Id.* § 36-1-102(1)(C).

There is no question that Mother was incarcerated at the time the Department's petition for termination was filed on January 10, 2014 so as to make this basis for termination applicable. At trial, Mother testified that she was incarcerated from December 24, 2013 through January 27, 2014.[5] Thus, we look to Mother's actions in the four-month period prior to December 24, 2013. In its February 5, 2016 order of termination, the trial court found that Mother only exercised three visits with the children during this period. Specifically, it found that Mother had visited with the children on September 28, 2013, October 5, 2013, and October 28, 2013. According to the trial court, this limited visitation "was token at best" and constituted a willful failure to exercise visitation.

On appeal, Mother does not challenge the trial court's finding that she only visited with the children on three dates in the applicable four-month period. Rather, she contends that the trial court's finding of willfulness cannot be sustained. Among other things, she notes that her visitation had previously been suspended on May 20, 2013.

Although an order suspending visitation rights does not preclude a finding that a parent willfully failed to visit a child, *see In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013) ("[T]he prior order suspending Father's visitation rights did not preclude a finding that Father willfully failed to visit the children."), this Court has previously found that active efforts to establish visitation rights are inconsistent with a

---

[5] We note that this testimony was corroborated by an inmate charge history that was introduced into evidence.

finding that a party willfully failed to visit. *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at \*6 (Tenn. Ct. App. Apr. 27, 2007). Mother is correct in her assertion that her visitation with the children was suspended in the months leading up to the applicable four-month period. The second permanency plan, which was created on May 20, 2013, specifically stated as follows: "At the time of the meeting held on 05/20/2013 the parents['] visitation was suspended due to ongoing concerns regarding CPS investigation and pass documentation from agency supervising the family's visits."[6] The record reflects that the second permanency plan was later ratified by the Juvenile Court on June 21, 2013.

Although Mother's visitation was suspended, notes from a May 2013 Child and Family Team Meeting Summary indicate that a hearing was scheduled for later that summer to address visitation. A specific hearing date of June 7 was referenced, but it is unclear if any judicial proceedings were held on that date. What is clear, however, is that visitation was eventually reinstated. As we have already noted, the trial court specifically found that Mother visited with the children on September 28, 2013, October 5, 2013, and October 28, 2013.

Although there is evidence that visitation was reinstated, the record is silent as to exactly when this occurred. It is certainly possible that visitation was reinstated prior to the four-month period applicable to this ground for termination, and yet, there is no evidence affirmatively establishing this fact. One could also speculate that visitation was not reinstated until sometime after the applicable four-month period commenced. The only clarity provided on this issue is that visitation was reinstated by September 28, 2013, approximately one month into the pertinent four-month period. Because the record is silent as to the specific date Mother's visitation was reinstated, Mother's failure to visit the children in the first month of the applicable four-month period is of questionable significance. Efforts were clearly made to reinstate visitation, and it would be unfair to ignore those efforts and ascribe fault to Mother for failing to visit the children during a period when visitation may have been suspended. With that said, as explained below, we are ultimately in accord with the trial court's determination that Mother's visits during the four-month period were of such an infrequent nature that they represented mere token visitation. Moreover, we find no error in the trial court's determination that Mother's failure to visit was willful.

Even assuming that Mother's visitation had been suspended until immediately prior to her September 2013 visit, her subsequent actions do not evidence efforts to foster meaningful parent-child relationships. *See In re Keri C.*, 384 S.W.3d 731, 751 (Tenn. Ct. App. 2010) ("[W]hile the parent's subjective intent and interest in the child is relevant,

---

[6] This quoted language was presented in all capital letters in the permanency plan itself.

the termination statutes generally require that such interest manifest in the form of objectively reasonable action geared toward establishing a healthy parental relationship."). At the latest, we know that Mother's visitation was reinstated by September 28, 2013. Over the roughly three months remaining in the applicable four-month period, Mother only visited with the children three times. While Mother did visit with the children twice in October of 2013, she did not make any visits in November or December of that year.

Although our focus is rightfully placed on Mother's conduct in the pertinent four-month period, Mother's relationship with the children prior to this time is relevant to determining whether the visitation during the four-month period was merely "token." *Id.* at 749. Indeed, the significance of facts during the relevant time period "is better assessed with an understanding of the parent's prior efforts to forge a relationship with the child, and whether a bond between parent and child had previously been established." *Id.* The evidence shows that prior to the relevant four-month period, the parents' visitation with the children posed a significant barrier to reunification. For example, when Andrea Byrd ("Ms. Byrd"), a former Department case manager for the children at issue, was asked what barriers prevented reunification, she responded as follows: "Visitation was a big one. There wasn't a lot of visitation that was occurring." Ms. Byrd stated that she worked on this case from January 2013 to April 2014, and her testimony reflects that the parents' visitation with the children was not only inconsistent, but also destructive. She indicated that Father frequently belittled Mother during visits, which she noted was of concern because "Jakob was starting to act that way towards [Mother] as well." Mother's own testimony indicated that in the months following the children's removal, Father would speak in a derogatory manner in front of the children during visits. Thus, for the visitations that did occur, they were marked by hostility.

Considered against this backdrop of visitations, Mother's three visits in the four months immediately preceding her December 2013 incarceration cannot be considered a reasonable effort to foster meaningful parent-child bonds with her children. The absence of beneficial visitation was a problem, and the infrequent nature of Mother's visits prior to her incarceration did little to forge meaningful relationships. We accordingly conclude that there is clear and convincing evidence to support the trial court's determination that Mother only engaged in token visitation during the relevant period.

We also conclude that the proof clearly and convincingly establishes that Mother's failure to engage in more than token visitation was willful. On appeal, Mother contends that there were several obstacles to her exercise of visitation. Namely, she asserts that the requirements added in the third permanency plan were "too much to be surmounted." The third permanency plan, which was created on November 18, 2013, required Mother to give at least 48 hours' notice before a visit, prevented Mother from exercising

visitation if she failed a drug screen, and directed Mother to exercise her visitation separate from Father. It is not entirely clear why Mother contends that the drug screening requirement posed an unreasonable burden to her visitation. We observe that notes from the November 18, 2013 Child and Family Team Meeting Summary indicated that Mother "has been passing drug screens." In any event, it was not unreasonable to condition Mother's right to visit on remaining drug-free given her past history. Such a requirement is far from atypical. *See, e.g.*, *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at \*8 (Tenn. Ct. App. Dec. 29, 2010) (visitation not permitted under a "no-contact" order until parent passed drug test). With respect to the other visitation requirements, Mother places blame at the feet of Father. She argues that she had difficulty in complying with the 48 hours' notice requirement because Father kept breaking her phone. Moreover, she argues that the requirement for separate visitation was a barrier because she relied on Father for transportation.

Although Mother testified that Father broke her phone on several occasions, her own testimony indicates that she was not without the ability to remain in the necessary communication regarding the children. When asked generally if there was ever a period that she could not communicate with the Department, Mother testified as follows: "Well, [Father] would break my phone periodically, that I may not have had a phone at the time, **but I would go to -- down to Ms. Barbara's and call**, and I was also at my home to get correspondence through the mail. (emphasis added) The referenced individual, Barbara C., lived close to Mother and was someone Mother considered to be a part of her support system. Mother even testified that she planned to allow Barbara to care for the children while she was at work if the children were returned to her. Inasmuch as Mother's own testimony indicates that she had the ability to use Barbara's phone to contact the Department, the fact that Father may have broken her phone on occasion is not a sufficient excuse to relieve her from making efforts to exercise visitation. Moreover, it is unclear how the separate visitation requirement imposed by the third permanency plan constituted any burden to Mother's visits. In her reply brief, Mother suggests that it was a barrier because she relied on Father for visitation, explaining as follows: "[T]he requirement for separate visitation removed any incentive for Father to assist Mother getting to visitation." Even if Father had been unwilling to take Mother to visitations, such unwillingness is no excuse. Although Mother may have depended on Father for transportation, she did not need to do so. The permanency plans entered in this case, including the third permanency plan, plainly indicate that the Department or provider agency would be able to provide transportation to and from visitations.

In Mother's brief, she also argues that no evidence was submitted as to whether visitation could be coordinated with her work schedule. At trial, she specifically suggested that the Department had not been accommodating of her work. Indeed, when asked how many times she thought she had visited the children in 2013, Mother

responded as follows: "I think that the only times that I haven't seen my kids through this whole episode . . . is when . . . they weren't accommodating for my working second shift or when visitation has been suspended."  It is unclear what relevance Mother's work schedule has to this basis for termination given the facts of this case.  According to Mother's own testimony, she was not working during the pertinent four-month period.  Considering the record as a whole, we therefore agree with the trial court's conclusion that Mother's failure to exercise more than token visitation with the children during the relevant period was willful.

The trial court also determined that Mother's parental rights should be terminated due to her failure to support the children in the four-month period prior to her incarceration.  This basis for termination is also part of the "first test" of abandonment as defined in Tennessee Code Annotated section 36-1-102(1)(A)(iv).  According to the trial court, the evidence introduced at trial clearly and convincingly showed that "Mother . . . willfully and intentionally failed to support her Children . . . during the . . . four (4) months preceding her incarceration on December 24, 2013."

"[A] court can only determine willfulness of a parent's failure to support where there is sufficient evidence regarding the parent's ability to pay."  *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at \*15 (Tenn. Ct. App. May 29, 2015).  In its brief on appeal, the Department concedes that the record is "not sufficiently illuminating to determine Mother's ability to pay support" in this case.  We agree.  As the Department indicated in its oral argument before this Court, the record is silent as to Mother's expenses during the relevant four-month period.  We therefore reverse the trial court with respect to this basis for determination, as there is an absence of clear and convincing evidence that Mother willfully failed to support her children in the four months preceding her incarceration.

In addition to concluding that Mother willfully failed to visit and support the children in the four-month period prior to her incarceration, the trial court found that the "second test" of Tennessee Code Annotated section 36-1-102(1)(A)(iv) had been established.  "The second test asks whether the parent 'has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.'"  *In re Audrey S.*, 182 S.W.3d at 865 (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)).  Notably, "it is not expressly limited to any particular four-month period."  *Id.*

As this Court has previously observed, this statute "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child."  *Id.* at 866.  Indeed, the "decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child."  *Id.* (citation omitted).  With that said, an

incarcerated parent can only be found guilty of abandonment under the second test of Tennessee Code Annotated section 36-1-102(1)(A)(iv) "if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Under the statute, "the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68 (citations omitted).

We agree with the trial court that clear and convincing evidence exists to support the conclusion that Mother engaged in conduct prior to her incarceration that demonstrated a wanton disregard for her children's welfare. An inmate charge history that was introduced into evidence shows that Mother was incarcerated on three occasions prior to her incarceration on December 24, 2013. With respect to her December 2013 incarceration, Mother testified that it stemmed from a violation of probation. When asked what offense her probation was related to, Mother asserted that she had been on probation for two charges: a DUI and reckless endangerment. She testified that the DUI occurred in August 2012 and indicated that Lukas had been with her at the time. The reckless endangerment charge stemmed from the condition of the home when her children were removed in October 2012. Although Mother argues in her brief that there is no proof in the record that she was actually convicted of the reckless endangerment charge, this assertion is contradicted by her own testimony. Indeed, as evident by the following exchange, Mother specifically admitted that she had been convicted of the offense:

Q. So you were charged with and convicted of reckless endangerment –

A. Yes.

Q. -- from when the children were removed from your home?

A. Yes.

There was also evidence that the children's welfare was potentially compromised by Mother's drug usage. We note that Jakob testified that Mother had often taken him to go drug dealing. Moreover, we note that when Lukas was born, he tested positive for drugs. In addition to these concerns, the trial court noted that Mother had "continued to

- 13 -

cohabitate with the Father, even after, by her own acknowledgement, she recognized his anger and inappropriate behaviors did not present an environment appropriate for her Children." The trial court also referenced Jakob's testimony that he observed a lot of fighting between his parents and extensive drinking of alcohol. Because we are of the opinion that clear and convincing evidence establishes Mother's wanton disregard for the children, we do not disturb the trial court's determination that this ground for termination is applicable.

*Abandonment Under Tenn. Code Ann. § 36-1-102(1)(A)(ii): Failure to Provide a Suitable Home*

The trial court also found that Mother abandoned the children by failing to establish a suitable home. This ground for termination is applicable when:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). Under this ground for termination, it is important to recognize that a "'suitable home requires more than a proper physical living location.'" *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at \*9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL

4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)).  For example, a suitable home "requires that the home be free of drugs and domestic violence."  *Id.* (citation omitted).

In concluding that this ground for termination existed, the trial court placed much emphasis on its finding that Father continued to have a presence in Mother's home at the time of trial.  Indeed, after chronicling the hostile nature of Mother and Father's relationship, the trial court found as follows:  "Mother and Father living together is clearly not a suitable home."  There is no question that Mother and Father's continued cohabitation presented an unsuitable home environment for the children.  Mother admitted as much in her brief, expressly conceding that the home was unsafe while Father was there.

The record is replete with examples demonstrating how Father's continued presence in the home was antithetical to the children's well-being.  Jakob, for example, testified that there was a lot of fighting in Mother's home.  When asked if this fighting was "just arguing," Jakob responded as follows: "It was a lot of physical."  At one point in his testimony, he recounted an occasion on which Father had pushed Mother:

> [O]ne time, you know, Mom tried to take me away because Dad -- she got tired of Dad fighting with her and stuff, so she tried to leave, but Dad went outside and Mom was trying to take me and Lukas.  Lukas was still in her stomach, and so we were running -- well, not really running, but she was going as fast as she could, and she went through -- she went past a big stump that we have, and when Dad pushed -- I mean, Dad pushed Mom over with me in her hands, and when she fell over, she hit this giant log, and it fell and hit my leg[.]

Immediately following this narrative, Jakob mentioned a time when Father shoved Mother onto a coffee table.

The domestic violence between Mother and Father spanned multiple years.  Based on Mother's testimony, we know that the domestic violence between the two occurred as early as August or September of 2011; although Father left Mother's home at that time, he would eventually return.  We also know that the violence was present as late as the spring of 2015.  In describing what prompted her to obtain an order of protection as to Father in March of that year, Mother revealed the following account:

> Well, I was getting ready for work one day.  [Father] was asking for my debit card so he could go rent Redbox movies.  I refused.  I had just gotten out of the shower and sat down to eat.  I had a small bowel [sic] of syrup.  He sat down on my bed and continued to ask me for my debit card.  And

- 15 -

when I continued to refuse, he kind of flung the bowl of syrup at me. And I got up, went took another shower, put on different clothes for work. I sat down in my room on my bed and tried to eat again, and he began to ask me again for the card. I said, This isn't going to work, so I went into the kitchen to make sandwiches to take to work with me. He followed me into the kitchen, continued asking me for the card, calling me names, and he picked up a kitchen knife, and he didn't try -- I mean, he didn't cut me with it or anything, but him holding it in the kitchen with me in the kitchen and his behavior from that day, I felt threatened.

The acrimony between Mother and Father was even present when Mother and Father exercised visitations with the children. Mother admitted that there had been occasions during visits where Father had laid hands on her in an inappropriate manner; she also indicated that there had been many visits where Father had spoken to her in a derogatory manner in front of the children. When she was asked whether Father's treatment of her presented an inappropriate environment for the children to be in, Mother responded, "Absolutely. Absolutely." At one visit at the Opry Mills mall, Jakob reported seeing Mother and Father "shoving each other around . . . and getting mad at each other." Although Mother admitted that she had a red mark on her face when she returned the children to their foster parent following the visit, she denied that the red mark was the result of anything that had occurred at Opry Mills. In addition to being directly hostile and violent to Mother, Father took his anger out on Jakob. Jakob testified that Father would get upset "over the stupidest things" and cuss him out. For example, he noted that although he and Father would go fishing together, Father often got very upset:

> [A] lot of the time, if I lost a fish, if I had to cut the rope or something -- o[r] if I had to cut the string or something, he would end up getting really mad at me, slapping me or something. And at one point, he got so mad, he took the fishing pole that he gave to me from the very start, and he took it and he just snapped it in half, and that's not okay. He just took it, snapped it, and he said, Try Fishing now.

The trial court was not without justification in concluding that Father's presence in Mother's home presented an unsuitable environment for the children, and we reject Mother's suggestion that the trial court did not determine that Father lived there at the time of trial. It is true that, at one point in its termination order, the trial court commented that it "ha[d] no idea where the Father is living." However, when this statement is viewed in context with the rest of the trial court's order, it is clear that it does not carry the significance that Mother might ascribe to it. The statement appears to be mere hyperbole or a reflection that the court did not personally know where Father was

- 16 -

living; indeed, subsequent to that statement, the trial court made several findings based on the proof presented that Father still lived with Mother:

> 38. Finding in fact, that the Court has no idea where the Father is living. The Court gives great weight to the State's witnesses, especially Father's probation officer . . . who testified that Father's current address that Father provided to the probation officer was the same address where the Mother currently resides. Mother has been adamant in her position that Father no longer resides in her home since the Domestic Violence incident that occurred in March of . . . 2015 . . . but **the Court gives greater weight to the State's witnesses and finds the proof supports the State's position that Mother and Father are still residing together**.
>
> . . . .
>
> 39. Finding in fact, that even though the Mother sits here today and testified that she is maintaining the dwelling where she resides the Court finds the home is not a suitable home due to the history wherein the Mother has time and again allowed the Father back into home, and as demonstrated by the testimony of the Child, Jakob, exposing the Children to the domestic violence, the arguing and fighting. What is extremely disturbing is that over a year after the State's Termination Petition was filed, in or around March of 2015, the parents once again become engaged in a domestic altercation that led to the issuance of an Order of Protection. **The Court finds Father still resides with the Mother**[.]

The evidence does not preponderate against the trial court's finding that Father still lived with Mother at the time of trial. Although Mother claimed that she had not spoken to Father since she obtained an order of protection against him in March 2015, the trial court was free to reject this testimony. "[T]rial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted). On appeal, we will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *Id.* (citations omitted). Moreover, we note that there were witnesses who offered evidence that connected Father to Mother's home even after an order of protection had been entered against him. Father's probation officer, Taisha Kuilan, testified that as late as September 2015, Father had represented that his address was 708 Wilowview Drive. This is the same address where Mother lived. Moreover, we note that a Department case manager testified that she had seen men's boots outside the home. This same case manager

asserted that in August 2015, she had seen mail inside the home that had been sent to Father.

The trial court not only concluded that Mother had failed to provide a suitable home due to Father's continued presence, but it also determined that she would not be able to provide a suitable home at an early date in the future. There is clear and convincing evidence to support the trial court's conclusion on this issue. Mother admitted that there was a long history of Father being in her life, out of her life, and back in her life again. Despite her testimony that Father was finally out of her life by the time of trial, the trial court found that Father was back in the home. Based on Mother's long-standing history of allowing Father back into the home, there were years of evidence to support the trial court's determination that Mother's home situation would not likely be suitable for the children at some point soon in the future.

While there is certainly adequate proof that Mother failed to provide a suitable home and would be unable to do so at an early date, we have already noted that this ground for termination specifically requires that:

> [F]or a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home . . . but that the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii). The entirety of the definition cannot be ignored. As noted by the Tennessee Supreme Court, "proof of reasonable efforts is required to prove the ground of abandonment by failure to provide a suitable home." *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn. 2015).

In this case, the trial court's order makes several references indicating that it focused on the four-month period immediately following the children's removal. For example, it noted that "[i]n the four months following the removal the parents['] residence was still unsuitable for the Children." Moreover, in referencing the Department's efforts, the trial court noted that "DCS made reasonable efforts to assist the parents toward the goal of reunification; toward assisting them with providing a suitable home during the four months following the removal[.]" Having reviewed the record, it is unclear what specific evidence exists regarding the Department's efforts in the four-month period immediately following removal. At the outset, we note that the case worker assigned to the case at the beginning of that period did not testify at trial. Although Ms. Byrd took over the case approximately three months after the children's

- 18 -

removal, her testimony concerning the Department's efforts was not specifically related to the fourth-month period immediately following removal. Indeed, outside of her recollection that a Child and Family Team Meeting occurred on February 15, 2013, her testimony about the Department's efforts was either non-specific as to the timing or concerned dates outside the first four months of the children's removal.

With respect to this point, we observe that although the Department's brief on appeal mentions several services that the Department provided to Mother, some of the testimony specifically referenced to support this point concerned a period of time well past the first four months following removal. For example, consider the following exchange between the Department's attorney at trial and Ms. Byrd, which appeared within a portion of the trial testimony referenced by the Department:

> Q. **And the permanency plan that you took out, Exhibit 4, from November 18, 2013**, is this same summary attached to it?
>
> A. Yes, sir.
>
> Q. And the concerns that you had that you discussed just a few minutes ago, are those based upon responsibilities and tasks that are outlined in that permanency plan?
>
> A. Yes, sir.
>
> Q. **What efforts did you try to make at that point in time? I know it was a few months before the TPR**, but what efforts did you make to try to assist the parents with those needs or concerns?
>
> A. Well, I always gave the parents blank budgets. I offered to sit down and help them complete the budget, child care plan, if they needed it. I maintained contact with the probation officer; initially, assisted with the assessments, which provided recommendations such as counseling. And [Mother] had already been involved with the Guidance Center so she was receiving those there. And I also would do random drug screens.

(emphasis added)

If this ground for termination depended on proof of efforts in the first four months following the children's removal, we could not find it applicable given the proof presented in this case. Indeed, although the evidence clearly shows that Mother failed to provide a suitable home for the children, the record is less than revealing about what

specific efforts were made by the Department in the four months immediately following the children's removal from Mother's home. According to an ordinary reading of the statute, however, the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to "a period of four (4) months following the removal," Tenn. Code Ann. § 36-1-102(1)(A)(ii), the ground may be established. The statute *does not* limit the court's inquiry to a period of four months *immediately* following the removal. We made this observation in a previous appeal, noting as follows:

> The statutory language in question provides only that DCS must make reasonable efforts "for *a period* of four (4) months following the removal. . . ." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(2005 & Supp. 2009) (emphasis added). A quick survey of this Court's case law suggests that the Code does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal. *See, e.g.*, *In re B.T.*, No. M2008-00946-COA-R3-PT, 2008 WL 4922532, at *8 (Tenn. Ct. App. Nov. 13, 2008) (*no perm. app. filed*) (evaluating the four-month period preceding the filing of DCS' termination petition); *In re J.C.W.*, No. M2007-02433-COA-R3-PT, 2008 WL 4414675, at *4-6 (Tenn. Ct. App. Sept. 26, 2008) (*no perm. app. filed*) (examining both the four-month period following removal and the four-month period preceding the filing of DCS' termination petition).

*In re J.D.L.*, No. M2009-00574-COA-R3-PT, 2009 WL 4407786, at *12 n.8 (Tenn. Ct. App. Dec. 2, 2009).

With this in mind, we note that although the trial court's findings do reference the first four months following the children's removal in analyzing this ground for termination, the trial court's findings are not strictly limited to this period. Indeed, the trial court's findings specifically reference the respective efforts made by Mother and the Department over the three plus years following the children's removal. Consider the following excerpt from the trial court's termination order:

> 42. Finding in fact, based upon the findings herein and the proof submitted, including the Exhibits, that the parents **over the past 3 plus years**, date of custody being October 22, 2012, have failed to make any reasonable efforts to better their position; that they have individually failed to provide a suitable home for the Children; and both have demonstrated by their own actions, as described herein this Order, a severe lack of concern for the welfare of their Children.

. . . .

44. Mother and Father have individually failed to provide a suitable home for their respective Children and/or have demonstrated a lack of concern for the Children, in that at the time of the removal they were not providing an appropriate home for their Children and they have failed to make any effort whatsoever to provide a home for their Children **over the course of the last three years preceding today's hearing**.

. . . .

46. Regarding reasonable efforts the Court finds, finding in fact and by conclusions of law, by clear and convincing evidence, that DCS has made reasonable efforts toward all of the grounds found herein and as applicable to the finding of best interests.

. . . .

Therefore based upon the aforementioned, the totality of the proof, including testimony and exhibits . . . the Court finds DCS made reasonable efforts to assist the parents toward the goal of reunification; toward assisting them with providing a suitable home **during the four months following the removal and throughout**[.]

(emphasis added).

Although we would agree that the evidence does not support the trial court's findings inasmuch as those findings specifically concern the Department's efforts in the first four months immediately after the removal, the evidence does support its determination that Mother failed to provide a suitable home despite reasonable efforts made by the Department for several years preceding the trial. Ms. Byrd was a case manager on this case from January 23, 2013 to April 2014. Her testimony reveals the multiple efforts the Department made to assist Mother during that period. In addition to helping to develop permanency plans and participating in Child and Family Team Meetings, Ms. Byrd performed random drug screens, assisted with assessments of the parents, offered to help Mother complete a budget and childcare plan, and maintained contact with the probation officer. According to Ms. Byrd, the Department also paid for therapeutic visitation and couples counseling. Concerning Father's presence specifically, Ms. Byrd testified that she had discussions with Mother about how Father's presence in her life was a barrier. Ms. Byrd also testified that she completed a referral for homemaker services and conducted some home visits. Sherry Davis ("Ms. Davis"), who

later worked on the case for approximately a six month period, testified how the Department also scheduled visits for family therapy. According to Ms. Davis, the Department discussed the need for family therapy in Child and Family Team Meetings. She described how the Department provided case management services and testified that the Department provided funding for whatever services were not being covered by Mother's means. Kimberly Roberts ("Ms. Roberts"), who took over as case manager on February 23, 2015, testified that she had conducted home visits and alerted Mother to certain physical concerns about her home. She also attempted to do random drug screens.

There does not appear to be any question that Mother addressed many of the environmental concerns associated with the children's removal. Mother testified that her home was certified as habitable within a week or two after it had been condemned, and Ms. Roberts asserted that Mother appeared to have made repairs to areas on the outside of the home that had been identified as concerns. Notwithstanding these efforts, we again note that "a suitable home requires more than a physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). As already detailed, Father's presence in the home clearly rendered the home unsuitable for the children. Mother's testimony indicated that Father remained in the home from the time of the children's removal until about a month before trial commenced. Save for an order of protection that was obtained against Father in the spring of 2015, there is no evidence that Mother made any meaningful attempt to establish a home free from Father during this period. Moreover, despite the order of protection, the trial court implicitly discredited Mother's testimony that Father remained out of the home at the time of trial. Indeed, the trial court specifically found that "Father still resides with the Mother." In light of the foregoing discussion, the record clearly and convincingly establishes the ground for termination outlined in Tennessee Code Annotated section 36-1-102(1)(A)(ii).

**Persistence of Conditions**

We next consider the trial court's determination that Mother's parental rights should be terminated pursuant to the ground for termination outlined in Tennessee Code Annotated section 36-1-113(g)(3). This ground for termination, commonly referred to as a "persistence of conditions," is applicable when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the

- 22 -

child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).   The purpose behind this ground for terminating parental rights is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'"   *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

In determining that this ground for termination was applicable, the trial court concluded that Mother had not demonstrated that she would be able to be protective of her children.  In pertinent part, the trial court found as follows:

[T]he Court finds conditions persist, namely Mother's failure to protect the Children from an environment wherein Mother and Father engage in inappropriate behavior which has escalated on more than one occasion to domestic violence, which prevent the Children from returning to Mother's care in the near future; further that there is little likelihood that these conditions will be remedied at an early date so that the Children could be returned to the Mother's care in the near future.

We agree that this ground for termination was sufficiently established.  The children were removed from Mother's care for over six months, and the evidence shows that a return of the children to Mother's care was inhibited by Father's continued presence.  As we have already noted, the trial court found that Father still lived with Mother when it entered its order of termination, and given Mother's history of allowing Father back into the home, the trial court was not without support in concluding that this concern would not be remedied in the near future.  Having concluded that there is clear and convincing evidence to support this ground for termination, we now move to the final ground for termination relied upon by the trial court.

## Substantial Noncompliance with the Permanency Plan Requirements

The trial court also terminated Mother's parent rights under the ground for termination contained in Tennessee Code Annotated section 36-1-113(g)(2). Pursuant to that statute, a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, 2014 WL 2587397, at *10 (citations omitted). "The trial court must then find that the noncompliance is substantial." *Id.* (citation omitted). Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Although there was some testimony indicating that Mother was not in strict compliance with all of the permanency plan requirements, we do not agree that there is clear and convincing evidence of substantial noncompliance in this case. In relevant part, we note that Ms. Roberts testified at trial that Mother had completed all of the tasks on her permanency plan. Ms. Roberts was assigned as a Department case manager to the case on February 23, 2015 and was the current case manager at the time of trial. Given the Department's representation at the time of trial that Mother had accomplished the permanency plan tasks required of her, we do not agree that this ground for termination was established by the requisite standard of proof. We therefore reverse the trial court's order to the extent that it terminates Mother's parental rights on this ground.

## Best Interests

Despite our conclusion that statutory grounds for termination exist, such proof does not by itself justify the termination of a parent's parental rights. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citation omitted), *perm. app. denied* (Tenn. Mar. 5, 2014). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then

prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

In this case, the trial court made several findings regarding the children's best interest. In concluding that Mother had not made the necessary changes in her conduct or circumstances, the trial court noted that Mother continued to reside with Father. The trial court stated that this continued relationship was inappropriate due to unaddressed issues of domestic violence. The trial court further found that Mother was unlikely to make any type of adjustment in the near future. The trial court noted that the majority of Lukas' life had been spent in foster care and also found that Jakob and Mother had no meaningful relationship. The court specifically observed that Mother had not visited with Jakob for a number of months prior to trial due to his refusal to visit with her. The trial court also found that the children were in a loving and stable home at the time of trial.

The evidence does not preponderate against the trial court's factual findings on these issues, and we agree that such facts and considerations provide clear and convincing evidence that terminating Mother's parental rights is in the children's best interest. The children need permanency in their lives. Lukas has been in foster care for the majority of his life, and Jakob expressed fear that Mother would be unable to care for him and Lukas if they were returned to her. Jakob was twelve years of age at the time he testified, and he specifically stated that he did not want to return to Mother. The evidence suggests that the children are happy in their current foster placement, and the foster parents testified that they desire to adopt the children. Having carefully reviewed the entirety of the record transmitted to us on appeal, we therefore affirm the trial court's termination of Mother's parental rights.

## CONCLUSION

We reverse the trial court's determination that Mother abandoned the children by failing to support them prior to her incarceration and that Mother failed to substantially comply with the requirements of the family permanency plans. However, because clear

and convincing evidence supports the remaining grounds for termination, as well as the trial court's determination that termination is in the children's best interest, we uphold the termination of Mother's parental rights.  Costs of this appeal are assessed against the Appellant Mother, Jessica K.  Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.


_____

ARNOLD B. GOLDIN, JUDGE